UNITED STATES of America,
Plaintiff–Appellee,

v.

Calvin DAYEA, Defendant–Appellant.

No. 93–10278.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 13, 1994.

Decided Aug. 5, 1994.

Sally S. Duncan, Phoenix, AZ, for defendant-appellant.

Joseph J. Lodge, Asst. U.S. Atty., Phoenix, AZ, for plaintiff-appellee.

Before: SCHROEDER, D.W. NELSON, and CANBY, Circuit Judges.

CANBY, Circuit Judge:

Calvin Dayea pleaded guilty to charges of involuntary manslaughter and assault resulting in serious bodily injury, both charges stemming from an automobile accident he caused while intoxicated. He now appeals his sentence. We vacate his sentence and remand for resentencing.

## BACKGROUND

In this case, as in too many others, the common criminal activity of drunken driving ended in tragedy. Early on July 3, 1992, Calvin Dayea began a day of drinking. At 9:00 p.m. that evening, he was driving his pickup truck west on Arizona State Route 260, on the White Mountain Apache Reservation. His truck crossed the center line of the highway and struck an oncoming Ford Taurus, occupied by four adults and two children. One of the occupants, Theresa Campsen, was seriously injured, suffering a broken clavicle, bruised sternum, minor contusions, and an injury to a vertebral disc in her neck. Dayea's truck then collided with an oncoming Chevrolet Blazer, occupied by Arizona Department of Public Safety (DPS) Sergeant David Zesiger. Zesiger died approximately ten minutes after the collision.

Dayea, who claims to have no memory of the accident or of events for some time prior to it, was taken to the hospital, where tests

showed that he had a blood alcohol level of 0.15% approximately two hours after the collisions. Dayea pleaded guilty to one count of involuntary manslaughter in violation of 18 U.S.C. §§ 1112 and 1153, and one count of aggravated assault resulting in serious bodily injury in violation of 18 U.S.C. § 113(f). He was sentenced to 51 months in prison, followed by 60 months of supervised release for the aggravated assault. The district court imposed a 36 month sentence, to run concurrently, for the involuntary manslaughter.[1] The court also ordered Dayea to pay $18,000 in restitution to Zesiger's widow.

## DISCUSSION

■ We review de novo the district court's interpretation of the sentencing guidelines. *United States v. Blaize*, 959 F.2d 850, 851 (9th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 2954, 119 L.Ed.2d 576 (1992). We will not disturb the court's factual findings, however, unless they are clearly erroneous. *Id.*

### I

■ The district court increased Dayea's base offense level by four, pursuant to U.S.S.G. § 2A2.2(b)(2)(B), on the ground that Dayea used a dangerous weapon in the commission of the offense. We conclude that this adjustment was unauthorized, because Dayea did not "use" a dangerous weapon within the meaning of the Guidelines.

■ Section 2A2.2(b)(2) lists certain specific offense characteristics for aggravated assaults which, if present, require the district court to adjust a defendant's base offense level:

(A) If a firearm was discharged, increase by 5 levels; (B) if a dangerous weapon (including a firearm) was otherwise used, increase by 4 levels; (C) if a dangerous weapon (including a firearm) was brandished or its use was threatened, increase by 3 levels.

A "dangerous weapon" is "an instrument capable of inflicting death or serious bodily injury." Section 1B1.1, comment. (n.1(d)). In light of this expansive definition, there is no question that a motor vehicle may qualify as a dangerous weapon. *See, e.g., United States v. Sanchez*, 914 F.2d 1355, 1363 (9th Cir.1990), *cert. denied*, 499 U.S. 978, 111 S.Ct. 1626, 113 L.Ed.2d 723 (1991). In fact, courts have found that, in the proper circumstances, almost anything can count as a dangerous weapon, including walking sticks, leather straps, rakes, tennis shoes, rubber boots, dogs, rings, concrete curbs, clothes irons, and stink bombs.[2]

---

1. Involuntary manslaughter has a base offense level of 10 if the conduct was criminally negligent, and a base offense level of 14 if the conduct was reckless. U.S.S.G. § 2A1.4. The district court determined that the higher offense level applied. It found no ground for any adjustments.

The base offense level for aggravated assault is 15. U.S.S.G. § 2A2.2(a). The district court added four levels pursuant to a finding that the assault resulted in serious bodily injury. *See* U.S.S.G. § 2A2.2(b)(3)(B). It added four more levels on the basis of a finding that Dayea used a dangerous weapon, his truck. *See* U.S.S.G. § 2A2.2(b)(2)(B). Dayea's total adjusted offense level for the aggravated assault count therefore was 23. Because the two counts are groupable offenses, and the total adjusted offense level for the aggravated assault count was greater than that for the involuntary manslaughter count, Dayea's total combined offense level was 23. *See* U.S.S.G. § 3D1.4.

The district court departed upward two levels, pursuant to findings that Dayea's conduct (a) resulted in property damage or loss not taken into account by the guidelines, (b) resulted in significant disruption of governmental function, and (c) significantly endangered the public welfare. *See* U.S.S.G. §§ 5K2.5, 5K2.7, 5K2.14. After applying a three level downward departure for acceptance of responsibility, Dayea's total offense level was 22. Dayea's criminal history category was 1, giving a possible sentencing range of 41–51 months.

2. *See United States v. Loman*, 551 F.2d 164, 169 (7th Cir.1977) (walking stick); *Tipler v. State*, 78 Okla.Crim. 85, 143 P.2d 829, 830–31 (1943) (leather strap); *Eagleston v. United States*, 172 F.2d 194, 199 (9th Cir.1949) (rake); *State v. Munoz*, 575 So.2d 848, 850–51 (La.App.1991) (tennis shoe); *People v. Carter*, 53 N.Y.2d 113, 440 N.Y.S.2d 607, 423 N.E.2d 30, 32 (1981) (rubber boot); *State v. Sinks*, 168 Wis.2d 245, 483 N.W.2d 286, 289–90 (1992) (dog); *Commonwealth v. Rossi*, 19 Mass.App.Ct. 257, 473 N.E.2d 708, 711 (1985) (ring); *State v. Reed*, 101 Or.App. 277, 790 P.2d 551, 551 (1990) (sidewalk curb); *People v. Orlando*, 305 Mich. 686, 9 N.W.2d 893, 895 (1943) (stink bomb); *Johnson v. United States*, 613 A.2d 888, 897 (D.C.App.1992) (hot clothes iron).

These cases involve interpretation of the term "dangerous weapon", "dangerous instruments,"

The Guideline's expansive definition of "dangerous weapon" makes application of section 2A2.2(b)(2)(B) something less than mechanical. If, during the course of an assault, an assailant scratches his head with a gun, he plainly is using a dangerous weapon. Equally plainly, however, this particular use ought not to qualify for an upward adjustment in the assailant's sentence, because it does nothing to increase his culpability. *Cf. Smith v. United States,* —— U.S. ——, ——, 113 S.Ct. 2050, 2056, 124 L.Ed.2d 138 (1993) (dictum that 5 year mandatory sentence for use of a firearm in connection with a drug trafficking offense inapplicable if defendant used gun to scratch his head). Thus, it cannot be that section 2A2.2(b)(2)(B) applies any time an object capable of causing serious injury (i.e., a "dangerous weapon") is "used" during an assault. Particularly is this so when the "weapon" is not as unambiguous as a handgun, but is one of the many instruments that are normally put to benign uses but are nevertheless capable of causing serious injury—instruments such as walking sticks or Dayea's pickup truck.

The key to narrowing the scope of the section's applicability to a class of uses that are rationally related to a defendant's culpability is to recognize that "use" of an object implies that the actor has an intent to achieve a particular purpose when he employs the object. Thus, for example, Blacks Law Dictionary 1541 (6th ed. 1990), defines "use" as "to carry out a purpose or action by means of."

 As we pointed out above, it cannot be that use of an instrument capable of inflicting serious bodily injury for any purpose whatsoever qualifies for an upward adjustment under subsection (B). The Guidelines contemplate a narrower class of purposes.

We might conclude that "a dangerous weapon was otherwise used" means "otherwise used with the intent to facilitate the assault." *Cf. Smith,* —— U.S. at ——, 113 S.Ct. at 2059 (to qualify for mandatory sentence under 18 U.S.C. § 924(c)(1), firearm "at least must facilitate or have the potential of facilitating the drug trafficking offense." (quotations and citations omitted)). This construction, however, still casts the net too broadly. It is not reasonable to suppose that the Guidelines intended an upward adjustment for use of a weapon (an automobile) when the offender drives his car to the place where he assaults the victim with his hands after he leaves his car. There is nothing about that use of a vehicle (helpful as it may have been toward the accomplishment of the assault) that necessarily makes the assault more deserving of punishment.[3] What makes use of a dangerous weapon (such as a vehicle) culpable conduct, warranting increased punishment, is use of such an object *in its capacity as a weapon*—that is, using it for the *purpose* of injuring or threatening to injure. Accordingly, we conclude that an upward adjustment under section 2A2.2(b)(2)(B) is authorized only when a defendant used an instrument capable of causing serious bodily injury with the intent to injure his victim. Dayea had no such intent; despite the horrible consequences of his driving, he was not using his truck *as a weapon.*

We followed this line of reasoning in *United States v. Torres–Lopez,* 13 F.3d 1308 (9th Cir.1994). In that case, the district court had imposed an upward departure under U.S.S.G. § 5K2.6 for use of a "weapon or dangerous instrumentality" in the commission of an offense (alien smuggling). The departure was based on reckless use of an automobile, in that the defendant driver jumped out of the vehicle while it was still

or "deadly weapon" as an element of the offense of assault with a dangerous (or deadly) weapon. In light of the Guidelines' expansive definition of "dangerous weapon," however, we consider it appropriate to use these cases as illustrations.

**3.** This feature of the Guidelines' definition of "dangerous weapon" distinguishes this case from *Smith,* in which the Supreme Court held that 18 U.S.C. § 924(c) (penalizing use of a firearm in connection with a drug transaction) applies to cases where the firearm is used as an

item of barter in a drug transaction. As the Court noted, whenever a firearm is used in connection with a drug transaction, the danger to society is dramatically increased. *Smith,* —— U.S. at ——, 113 S.Ct. at 2059.

Unlike section 924(c), which is limited to inherently dangerous weapons, U.S.S.G. § 2A2.2(b)(2)(B) applies to virtually any physical object. Hence, the Court's reasoning in *Smith* cannot be imported wholesale into our analysis.

rolling. We rejected the departure, stating that "a car is not a dangerous instrumentality under § 5K2.6 unless it is used with the intent to cause harm." *Id.* at 1312.

 That Dayea was intoxicated does not alter our conclusion, because it does not alter Dayea's purpose in using his truck. Unquestionably, driving while intoxicated is a reckless and terrible thing to do. For that reason, a drunk driver may be subject to criminal charges for injuries he inflicts, or for the very act of driving while intoxicated. But the adjustment required by section 2A2.2(b)(2)(B) is for using a weapon; that is, for using an object capable of causing serious injury with the intent to injure with it. No matter how negligently or recklessly Dayea drove his truck, he simply was not using a dangerous weapon within the meaning of section 2A2.2(b)(2)(B) because he had no intent to injure with his truck.[4]

This conclusion comports with the structure of section 2A2.2(b)(2). Subsection (C) requires a three-level increase if a dangerous weapon was "brandished or its use was threatened." Brandishing and threatening are both intentional uses of an object in its capacity as a weapon. Although one does not normally "brandish" a motor vehicle, it can be done, or the vehicle's use as a weapon threatened, by intentionally making a move as if to run someone over.

Subsection (B) provides for a four-level increase, suggesting a higher degree of culpability. It applies if "a dangerous weapon (including a firearm) was otherwise used." U.S.S.G. § 2A2.2(b)(2)(B). "Otherwise used" means "more than brandishing, displaying, or possessing ... a dangerous weapon." U.S.S.G. § 1B1.1, comment. (n.1(g)). It would not be rational, in light of the guideline's escalating levels of culpability, to do away with the requirement of intent for this subsection, which carries a four-level increase, while retaining it for subsection (C), which carries only a three-level increase. The only use of a truck that exceeds its intentional use as a weapon to threaten a

victim is its intentional use as a weapon to injure or attempt to injure a victim. Dayea made no such intentional use of his truck.

 We conclude that when a motor vehicle is involved in an aggravated assault, a district court may not add four levels pursuant to U.S.S.G. § 2A2.2(b)(2)(B) unless the defendant used the vehicle with an intent to injure with it. Here, the district court found only that Dayea's conduct was reckless, not intentional. Therefore, Dayea's sentence must be vacated.

## II

After determining Dayea's adjusted offense level, the district court departed upward two levels pursuant to findings that Dayea's conduct (a) resulted in property damage or loss not taken into account by the Guidelines, (b) resulted in significant disruption of governmental function, and (c) significantly endangered the public welfare. *See* U.S.S.G. §§ 5K2.5, 5K2.7, 5K2.14. There is no support in the record for a departure on any of these grounds.

 The district court's findings of significant disruption of governmental function and significant endangerment of the public welfare are based solely on the testimony of one member of the deceased officer's DPS unit, Sergeant Claude Johnson. Johnson testified that Zesiger's death had an "effect on the ability of the Department of Public Safety to do their job." However, when asked to explain what this effect was, he observed that "there was a lot of stress within officers. They were not concentrating on their job." When pressed to quantify or otherwise more specifically explain, Johnson responded only that, "I believe that there were many times the officers were out there, and they, perhaps, weren't fully concentrating on what they should be doing."

This testimony is insufficient to support a finding that the department's functioning was impaired in any way, much less significantly, or that the public welfare was endangered significantly. That officers were stressed does not necessarily imply that they were

---

4. That the truck was the proximate cause of a victim's injuries is irrelevant. Application of section 2A2.2(B)(2)(B) depends on a defendant's purpose in using an object. It does not automat-

ically apply because an object capable of causing serious injury did so. Its focus is on the defendant's intent, not on the role any particular object played in the offense apart from that intent.

performing their jobs so poorly that the department's governmental function was significantly disrupted. In fact, that the officers were stressed does not necessarily imply that they were performing their jobs poorly at all. Because no evidence before the district court demonstrated any actual disruption of police activity, the district court clearly erred in making the contrary determination.

■ The only remaining basis cited by the district court for its departure is property damage in the amount of $165,000. However, only $13,595.43 of the $165,000 actually is due to property damage—this is the value of Sergeant Zesiger's vehicle. The remainder comprises consequential financial losses to Sergeant Zesiger's widow, such as increased insurance premiums, and loss of a portion of Sergeant Zesiger's retirement benefits. The government does not contend that property damage of only $13,595.43 is sufficient to warrant an upward departure when the harms caused by the underlying offense are death and serious bodily injury. *See* U.S.S.G. § 5K2.5 (advising that the extent of the increase should normally depend on "the extent to which the harm to property is more serious than other harm caused or risked by the conduct relevant to the offense of conviction."); *see also United States v. Luscier,* 983 F.2d 1507, 1513 (9th Cir.1993) (where amount of property damage pales in comparison to harm caused by the offense of conviction, no departure is warranted). It contends, instead, that the full $165,000 may be taken into account to justify the departure, claiming that section 5K2.5 "refers not only to property damage but also to other loss and harm caused by the defendant."

We disagree. Section 5K2.5 refers to "property damage or loss," not to "property damage or other loss or harm." "Property" plainly modifies both "damage" and "loss." This construction becomes apparent in the policy statement of section 5K2.5, which provides that one of the two factors on which the extent of departure should be based is "the

extent to which the *harm to property* is more serious than other harm caused or risked by the conduct relevant to the offense of conviction." (Emphasis added). The reference is clearly to loss or damage of property only. The government offers, and we can discover, no authority to support its contrary construction.[5]

## CONCLUSION

Because Dayea did not intentionally use his truck for the purpose of injuring the victim of his aggravated assault, the district court's four-level increase pursuant to U.S.S.G. § 2A2.2(b)(2)(B) was unauthorized. In addition, there is no support either in the record or in the Guidelines for the court's two-level upward departure from the applicable Guideline range. Accordingly, we vacate Dayea's sentence and remand for resentencing.

**SENTENCE VACATED; REMANDED FOR RESENTENCING.**

---

5. We note, moreover, that accepting the government's argument logically entails allowing virtually all consequential financial losses caused by a victim's death to be used in computing a defendant's sentence—a rule that would produce startling and unacceptable results. For example, on the government's position, there is no reason

why a property damage calculation should not include the victim's future earnings. Thus manslaughter of a 35–year–old neurosurgeon would result in a significantly greater sentence than would manslaughter of a 35–year–old short-order cook.